Matter of Coordinated Tit. Ins. Cases (2004 NY Slip Op 50171(U))

[*1]

Matter of Coordinated Tit. Ins. Cases

2004 NY Slip Op 50171(U)

Decided on January 8, 2004

Supreme Court, Nassau County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 8, 2004

Supreme Court, Nassau County
In the Matter of COORDINATED TITLE INSURANCE CASES.
JOSEPH PISCIONERI and CHRISTINA PISCIONERI, on behalf of themselves and 
 all others similarly situated, Plaintiffs,
against
COMMONWEALTH LAND TITLE INSURANCE CO., Defendant.
MICHAEL J. SCUORZO and DONNA J. SCUORZO, on behalf of themselves 
 and all others similarly situated, Plaintiffs,
against
LAWYERS TITLE INSURANCE CORPORATION, Defendant.
ROSA SMAJLAJ and LAZDER SMAJLAJ, on behalf of themselves and all 
 others similarly situated, Plaintiffs, 
against
FIRST AMERICAN TITLE INSURANCE COMPANY OF NEW YORK, Defendant.
ADAM GOOD, on behalf of himself and all others similarly 
 situated, Plaintiffs, 
against
AMERICAN PIONEER TITLE INSURANCE COMPANY, Defendant.
SCOTT WILLIAMS, SUSAN WILLIAMS, f/k/a SUSAN DiPAOLA, JAMES SMITH and SUSAN SMITH, on behalf of themselves and all others similarly situated, [*2]Plaintiffs,
against
FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, Defendant.
JOHN E. LAWLOR, on behalf of himself and all others similarly 
 situated, Plaintiffs,
against
NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, INC., Defendant.
ELIZABETH WERTER, on behalf of herself and all others similarly 
 situated, Plaintiffs,
against
CHICAGO TITLE INSURANCE COMPANY, Defendant.
JEFFREY SCHWARTZ and LESLIE SCHWARTZ, on behalf of themselves 
 and all others similarly situated, Plaintiffs,
against
STEWART TITLE INSURANCE COMPANY, Defendant.
INDEX NO. 010764/2002

Ira B. Warshawsky, J.
Plaintiffs Rosa and Lazder Smajlaj, James and Susan Smith, Adam Good, John Lawlor, Joseph and Christina Piscioneri, Jeffrey and Leslie Schwartz, Michael and Donna Scuorzo, [*3]Elizabeth Werter, and Susan and Scott Williams (the "Proposed Class Representatives"), have brought independent actions against the defendant title insurance companies. Plaintiffs argue that defendants routinely collected premiums in excess of that to which they were legally entitled in connection with refinance transactions. Plaintiffs allege violations of the deceptive business conduct statute (General Business Law § 349), common law fraud, and unjust enrichment. Each plaintiff individually moved for class certification pursuant to CPLR article 9. Plaintiffs' motions for class certification are granted.
The initial eight independent actions were brought in various counties in and around the city of New York including Nassau and Westchester. Pursuant to the defendants' motion to consolidate the actions, on November 26, 2002, the State of New York Litigation Coordinating Panel issued an order consolidating and coordinating all of the above-mentioned cases for decision before the undersigned to determine if these matters should be certified as a class action. Panel Case Number 0003/2002. 
In the spring of last year this court rendered a decision in the case of Good v American Pioneer Title Insurance Company, (Sup Ct, Nassau County, April 25, 2003, Warshawsky, J., Index # 02-010335), directing that the matters proceed rather than being stayed and referred to the New York State Insurance Department ("NYSID"). That decision is currently pending a decision of the Appellate Division, but the parties have requested that said appeal be stayed pending a decision by this court on the issue of class certification.
FINDINGS OF FACT AND CONCLUSIONS OF LAW
Title insurance is sold in connection with mortgage loan and refinancing transactions. Typically, the homeowner or party refinancing will pay the cost of the premium. The beneficiary of the policy is the lender, who's collateral for the loan is thus insured in instances where a title challenge arise. Borrowers may purchase their own policy, a "fee" or "owner's" policy. However, these proposed class actions are related to the sale of so called "loan" policies.
News reports indicate that title insurers pay out 47 cents for every $10 collected. (Simon, Refinancing Boom Put New Pressure on Title Industry, Wall Street Journal [Dec. 18, 2002, Section A, at 9]. This compares with a payout rate of $8.70 for every $10 collected in the casualty insurance industry. (Id.) Americans paid approximately $11 billion for title insurance and related services in 2002. (See id.)
New York's legislature has enacted legislation to ensure that insurance rates are regulated to "promote the public welfare." (Insurance Law, art 23, § 1). The insurance laws are not simply a consumer protection statute, but are also meant to ensure the health and vitality of the insurance industry. (See, Insurance Law art 23, § 1; § 3). Each licensed insurer must file its schedule of rates with the state's insurance superintendent. (Insurance Law, art 23, § 5). Insurers may delegate their Insurance Law, article 23, § 5 obligations to a "designated rate service organization." (Insurance Law, art 23, § 6). Pertinent to the matter before us, all of the defendant title insurance underwriters have delegated their obligation to file their rate schedules with the superintendent to the Title Insurance Rate Service Association ("TIRSA"). TIRSA was licensed by the New York State Insurance Department on November 19, 1991. All eight of the defendants in these coordinated actions are members of TIRSA as of February 11, 2002.
Individuals refinancing their home mortgages are to pay a reduced premium according to TIRSA's self-written regulations when four criteria are met. The discounted premium applies when (1) an application is made for a loan policy of title insurance; (2) within ten years from the [*4]date of closing of (a) a previously insured mortgage or (b) fee interest; (3) the premises to be insured are identical to the premises previously covered by eligible insurance, and (4) there has been no change in the fee ownership. The TIRSA regulations state that if the criteria are met, "the charge for insurance shall be" 50% or 70% of the of the "applicable loan rate." TIRSA Insurance Rate Manual § 14. A brief survey of the record indicates that overpayments generally amount to several hundred dollars.
 Plaintiffs' counsel contends that each of these title insurance cases is a prototypical class action and each exemplifies the purpose of a class action, eloquently stated by Judge Lazer in the landmark case, Friar v Vanguard Holding,
 The class action is seen as a means of inducing socially and ethically responsible behavior on the part of large and wealthy institutions which will be deterred from carrying out policies or engaging in activities harmful to large numbers of individuals. Absent the class action lawsuit these institutions will be permitted to operate virtually unchecked because the injured potential plantiffs frequently are damaged in a small sum [and] our legal system inhibits the bringing of suits based upon small claims.
(78 AD2d 83, 94 [2d Dep't 1980]).
Here, every plaintiff and Class member has allegedly been damaged by a few hundred dollars, while each title insurance defendant has allegedly collected millions of dollars from their failure to comply with their own filed and state-approved title insurance premium rates.
Defendants argue that class certification is inappropriate on the grounds that in each transaction where the full rate was charged, specific ingredients could mitigate if not eradicate any liability on the part of the defendants. Mortgage transactions often require the presence of numerous people, some representing the borrower, who, defendants argue, might have the duty to secure the reduced premium. More specifically they point out that in order to establish any underwriter's liability to any putative class member, the facts unique to the refinancing transaction of that individual will have to be examined at trial, thus destroying the economy of time that is a key benefit of the class action. (See, Froehlich v Toia, 71 AD2d 824 [4th Dep't 1979]).
As is apparent, plaintiffs and defendants ask the court to analyze the motion for certification from vastly different perspectives. Plaintiffs see a routine on the part of the defendants of charging more than the legally mandated allowable rates. Plaintiffs would like to begin the inquiry by asking what happened at the top of the title insurance pyramid. Defendants see the occurrence of overcharging as an isolated event occurring for any of a variety of reasons but certainly not because of recklessness or nefarious intent on their part.
 These are essentially the positions of the parties. They are argued, answered and replied to by highly competent counsel in both broad strokes and in detail. The Court will address each of the arguments presented, along with the qualifications of each proposed class representative.
CPLR 901 (a) provides:
One or more members of a class may sue or be sued as representative parties on behalf of all if:
[*5](1) the class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;
(2) there are questions of law or fact common to the class which predominate over any questions affecting only individual members;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;
(4) the representative parties will fairly and adequately protect the interests of the class; and
(5) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.
The consolidation panel's coordinating order caused the parties to submit joint memoranda of law arguing for and against certification of the eight separate classes. Both sides also submitted supplemental memoranda of law for and against each of the named plaintiffs. Each side's joint memorandum contains the bulk of the arguments related to CPLR 901 (a) (2) and (5). The supplemental memoranda opposing or supporting certification relate to each individual prospective class representative and focus largely on those individuals' suitability to represent the proposed class vis a vis CPLR 901 (a) (3) and (4).
General Background of the Law.
At the class certification stage, inquiry into the merits is limited "to whether on the surface there appears to be a cause of action which is not a sham." (Brandon v Chefetz, 106 AD2d 162, 168 [1st Dept 1985]). The complaint alleges common law fraud, violations of General Business Law § 349, and unjust enrichment. Plaintiffs allege that the failure of the defendants to charge the mandated, discounted premium for a refinance was the result of routine, material omissions. The allegations are supported by deposition testimony of, inter alia, representatives of the defendant title insurance companies suggesting that they did not have a general practice, policy or procedure to send, nor required their title agents to send, the TIRSA mandated disclosure notice of the potential availability of the mandated discount to qualified re-financers. (Plaintiffs' Joint Memorandum of Law in Support of Class Certification at 18 ["Plaintiffs' Jt. Mem"]). News reports discuss the apparent problem and contain a direct quote from a title insurance industry association executive suggesting the industry is aware of a "problem." (See Harney, Discounts on Title Coverage Hidden, Newsday, April 11, 2003, Section C at 11). Defendant Fidelity National Title ("Fidelity National") conducted an audit of twenty files from policies sold by its agent, Superior Abstract Corporation ("Superior"). Fidelity National was able to determine that Superior had "charged the full rate instead of the discounted rate" for seven of the twenty reviewed transactions" Affidavit of Michele Fried Raphael in support of Plaintiffs' Motions for Class Certification at Exhibit 2 ("Raphael Aff."). Based on this preliminary evidence, plaintiffs meet the threshold inquiry of Brandon v Chefetz, supra.
New York's class action statute is to be "liberally construed" and read to "favor the maintenance of class actions." (Englade v Harper Collins Publishers, Inc., 289 AD2d 159 [1st Dep't 2001]). It is also clear that "[d]espite" the "recognition that CPLR article 9 should be broadly and liberally construed, we cannot grant class action certification where it is unwarranted on the law and [*6]facts of a case." (Evans v City of Johnstown, 97 AD2d 1, 2 [3d Dept 1983]). This court is quite cognizant of the reality that class certification may place "hydraulic" pressure on defendants to settle, "even when the probability of an adverse judgment is low." (Newton v Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F3d 154, 168 [3d Cir 2001]). Plaintiffs bear the burden of proof on these motions. It is against this backdrop that we proceed.
CPLR 901 [a] [1]. Numerosity.
Defendants collectively wrote over one million policies during the period for which class certification is sought. Defendants' Jt. Mem. at 13. Defendants stipulated to the numerosity prerequisite for class certification. Minutes of Proceedings before Warshawsky, J., Jan. 29, 2003, at 14-16, Raphael Aff. Ex. F. Numerosity is thus not at issue and the requirement is met.
CPLR 901 [a] [2]. The predominance of common issues of law or fact.
This sub-section directs the court to determine whether common issues of fact or law predominate over any individual claims that may also affect possible class-action litigation. In Friar v. Vanguard Holding Corp., supra, the court established a flexible test to determine commonality and effectuate the broad goals of CPLR article 9:
[T]he decision as to whether there are common predominating questions of fact or law so as to support a class action should not be determined by any mechanical test but rather, whether the use of a class action would 'achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated.
78 AD2d at 97.
However, it has also been noted that the predominance requirement is the "most troublesome." (Ackerman v Price Waterhouse, 252 AD2d 179, 191 [1st Dep't 1998]).
The Appellate Division has vacated class certifications previously where "the record was insufficient to make an informed determination as to all of the pre-requisites to certification of a class action." (Negrin v. Norwest Mortgage, Inc., 293 AD2d 726, 727 [2d Dep't 2002]). However, the pleadings, affidavits, and affirmances provided by the parties in the case at bar contain more than sufficient information to rule competently on plaintiffs' motion for class certification.
Plaintiffs' brief in support of class certification lists fourteen common issues of fact or law that are likely to predominate in the disposition of their claims. They are:
1) whether the defendant title insurer routinely fails to provide the reissue rate in accordance with Section 14 of the TIRSA Rate Manual; 2) whether the defendant title insurer engages in deceptive and misleading conduct in violation of General Business Law § 349 by collecting premiums in excess of those permitted by the TIRSA Rate Manual; 3) whether the defendant title insurer engages in deceptive and misleading conduct in violation of General Business Law § 349 by routinely failing to notify the person who gets the loan and pays the premium that they may be entitled to a reduced premium rate, as required by Section 14(c) of the TIRSA Rate Manual; 4) whether the defendant title insurer commits common law fraud by routinely not informing homeowners of the availability of the discounted premiums and then charging and collecting premiums in excess of those permitted by Section 14 of TIRSA's Rate Manual; 5) whether title agents are agents of the defendant title insurer as a matter of law; 6) whether the defendant title insurer is liable for the actions of its agents who facilitate the aforesaid nondisclosures and overcharges and then split the premiums with the defendant; 7) whether each defendant title insurer adequately trains its agents with respect to disclosing and/or charging the reissue rate; 8) whether each defendant title insurer adequately monitors its agents with respect to disclosing and/or charging the reissue rate; 9) whether defendant title insurer's improper deceptive acts and practices should be enjoined; 10) whether each defendant title insurer was unjustly enriched by collecting premiums in excess of the rates permitted by the TIRSA Rate Manual; 11) whether the members of the Class have sustained damages and, if so, what is the proper measure of such damages; 12) what is meant by "a previously insured mortgage or fee interest" as set forth in Section 14 of the TIRSA Rate Manual for entitlement to the reduced premium rate; 13) what is meant by the "premises to be insured are identical" as set forth in Section 14 [*7]of the TIRSA Rate Manual for entitlement to the reduced premium rate; and 14) what is meant by "no change in fee ownership" as set forth in Section 14 of the TIRSA Rate Manual for entitlement to the reduced premium rate on a refinance? (Plaintiffs' Jt. Br. at 13-15).
Defendants contend that there are individual questions of law or fact that predominate to defeat the economies that are the benefit of the class action format of litigation. "Class actions are not appropriate where questions involving individual members of the putative class predominate as a matter of law and fact." (Jones v Christian, 120 AD2d 367, 369, [1st Dep't 1985]). "It is only where this predominance exists that economies can be achieved by means of the class action device." 39 F. R. D. 69, 103 (Advisory Comm. Notes, 1966 Amendments to Fed. R. Civ. P. 23).
The initial contention by the defense is that merely labeling the alleged conduct of the defendants "routine" does not mean that the case is suitable for adjudication as a class action. "In deciding whether this [commonality and predominance] prerequisite is satisfied, the Court considers 'whether the proposed class members are more bound together by a mutual interest in the adjudication of common questions than they are divided by the individual members' interest in matters peculiar to them.'" (Michels v. Phoenix Home Life Mutual Insurance Comp., 1997 N.Y. Misc. LEXIS 171, *28 [Sup Ct, Albany County, January 5, 1997, Teresi, J., Index No. 5318-95], quoting 2 J.B. Weinstein, et al., New York Civil Practice P 901.11). Defendants urge, as discussed elsewhere in this opinion, that the presence of intermediaries such as mortgage brokers, the possibility that consumers had knowledge or should have had knowledge of the discount rates, and the possibility that the TIRSA notice was sent to consumers, a change in the premises, or any combination of these or other factors need to be examined for every transaction because they might lead to a reasonable explanation as to why the full premium rate was charged.
It bears mention that defendants, in their own memorandum of law in support of their joint motion for coordination of these actions, argued that "each of the class actions presents the same basic factual allegations" involving the same legal theories. The "common issues presented in the class actions will, to a large extent, be determinative of the plaintiffs' claims." Defendants' Mem. In Support of the Jt. Motion for an Order of Coordination, 5-6.
The likelihood of whether the individual issues of fact and law set forth by the defense will predominate requires close examination of said issues against the plaintiffs' theories of liability.
A. Plaintiffs' Fraud Claim. The plaintiffs' fraud claim is the only claim that is capable of sustaining punitive damages. In common law fraud claims, proof of plaintiff's reliance is crucial. Defendants central argument is that individual issues of reliance will necessarily predominate over any common issues at trial. However, while reliance is a key element of common law fraud, reliance has been presumed in certain cases involving material omissions. The Appellate Division has recognized the application of a presumption of reliance. (See, Ackerman v Price Waterhouse, 252 AD2d 179, 197-98 [1st Dept 1998]).
New York precedent is persuasive that issues of reliance are not an impediment to class action certification. While no case states a bright line rule that reliance is presumed in fraud cases involving omissions of material fact, the Appellate Division said that, "once it has been determined that the representations alleged are material and actionable, thus warranting certification, the issue of reliance may be presumed, subject to such proof as is required on the trial." (Weinberg v Hertz Corp, 116 AD2d 1, 7 [1st Dep't 1986], aff'd, 69 NY2d 979). Other jurisdictions concur. (See, Cope v. Metropolitan Life Ins. Co., 696 NE2d 1001, 1004-05 (Ohio 1998)(noting "Courts generally find that [*8]the existence of common misrepresentations obviates the need to elicit individual testimony as to each element of a fraud or misrepresentation claim, especially where written misrepresentations or omissions are involved.").
Certainly failure to notify consumers of the availability of the reduced premium can be viewed as a material omission. If, in the review of files, defendants are able to show that actual notice was sent to a particular consumer, this evidence may be interposed at a later stage. (Super Glue Corp. v Avis Rent A Car System, Inc., 132 AD2d 604, 607 [2d Dep't 1987])("there is no per se rule that actions sounding in fraud are unsuited for class certification under CPLR article 9, and the mere presence of a question of individual reliance does not preclude class action certification."); (Weinberg v Hertz Corp., supra)("Whether reliance is to be presumed is a matter for trial and will not be disposed of in conjunction with this motion for class certification."); Brandon v Chefetz, supra, at 168)("The question of reliance is at best a matter of defense to be interposed with respect to individual claims after there has been a determination of liability.").
Further weighing against the defendants' argument that individual issues of reliance predominate is the difficulty of imagining a scenario where a consumer would agree to pay more for a product than the law allows. The basic notion that people generally don't agree to overpay was key to the court's reasoning in the Friar decision: "It is almost impossible to envisage circumstances in which a seller would willingly confer a financial gratuity upon the buyer's lender." 78 AD2d at 98.
In conjunction with the common law fraud claim, the defendants argue that an attempt to prove punitive damages will involve scrutiny of each individual Agency Sellers' behavior because it is they who were responsible for the vast majority of the title insurance policies sold. Imputing punitive damages for the acts of the Agency Sellers is legally unsupportable absent a showing of direct participation by defendants in the alleged conduct. (See, Camillo v. Geer, 185 AD2d 192 [1st Dep't 1992]). However, the allegations in the complaint concern the defendants' duty and conduct, not that of the agents. Thus the plaintiffs will be seeking to prove that the defendants' actions caused the behavior of the agency sellers, not to prove that the agency sellers themselves were acting with the malicious, wanton, or recklessness that must be shown to recover punitive damages.
This court thus finds that individual issues of reliance do not preclude certification for the plaintiffs' fraud claim.
B. Plaintiffs' GBL § 349 Claim. The liability inquiry under General Business Law § 349 is whether defendant "is engaging in an act or practice that is deceptive or misleading in a material way and [ ] plaintiff has been injured by reason thereof." (Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 NY2d 20, 25, [1995]). A deceptive act or practice is objectively defined as a representation or omission "likely to mislead a reasonable consumer acting reasonably under the circumstances." (Id. at 26). The Court of Appeals has held that reliance and scienter are not elements of a General Business Law § 349 claim. (See, Id). Thus, individual issues as to the putative-class members' reliance and the scienter of defendants do not preclude certification of the General Business Law § 349 claim.
Common issues of fact and law predominate over any individual questions that may arise in the adjudication of the plaintiffs' General Business Law § 349 claim. Defendants' correctly note that "[w]hile justifiable reliance is not, per se, an element of a § 349 claims, courts have repeatedly held that the conduct of the defendant must be shown to have been the cause in fact of the injury to the plaintiff in any § 349 claim." Defendants' Jt. Br. at 31, quoting Small v. Lorillard Tobacco Co., 94 NY2d 43, 55 [1999]). The question raised in the complaint involves the conduct of the defendants in allegedly overcharging or failing to notify the members of the [*9]putative class of the availability of the mandated discounts. Because the allegations, as framed in the complaint, involve largely omissions and not affirmative representations, no individual issues of what the defendants' said will predominate. Emphasis supplied. In the cases cited by the defendants involving § 349 claims, class certification was denied in instances of affirmative misrepresentations. (Goshen v Mutual Life Ins. Co. of N. Y., 1997 WL 710669 [Sup Ct NY County 1997]); (Karlin v IVF America, Inc., 239 AD2d 562 [2d Dep't 1997])(denying class certification of General Business Law §349 claim against a fertility clinic where issues existed as to what clinic personnel told each client about success rates at the clinic); (Morgan v A.O. Smith Corp., 233 A. D. 2d 375 [2d Dep't 1996]); (Vermeer Owners, Inc. v Guterman, 169 A. D. 2d 442 (1st Dep't 1991), aff'd, 78 NY2d 1114 [1991])(denying class certification in fraud case involving misrepresentations to co-op investors); Russo v Massachusetts Mut. Life Ins. Co., 192 Misc 2d 349 [Sup Ct Tomkins County 2002])(involving "vanishing premiums" claims which turn largely on what insurance agents told consumers while selling certain life insurance policies). There is no question that the cases cited by defendants turned on actual representations. In the instant case, plaintiffs allege in large part that defendants simply failed to represent the discounted premiums to their clients. Emphasis supplied.
Small v Lorillard Tobacco Co., 94 NY2d 43 [1999] is also cited by the defendants. The class in Small was ultimately denied certification for claims against the manufacturers of various cigarette brands. The claims, including a General Business Law § 349 claim, were based on advertising by tobacco companies and their withholding of relevant health information. The Appellate Division ruled that "individual proof of addiction" was vital to prove the claim, and proof of addiction was too subjective to be done on a class-wide basis. (Id. at 56). The individual proofs of injury, therefore, would have been fatal to the plaintiffs' claims. (Emphasis supplied). The plaintiffs allowed addiction to be removed from the alleged harms suffered. In doing so, the plaintiffs' claims ceased to contain the actual harm required for a prima facie case under a General Business Law § 349 claim. (Id.). Nonetheless, the trial court in Small did note that a "claim which turns on proof of actual addiction would involve far too many subjective factors." Id. at 51-2.
The proof of the actual harm of addiction that was so nettlesome to the GBL claim in Small is no problem here because the harm asserted by the plaintiffs is measurable in dollars and cents. It is important not to confuse the issues of proving actual harm with issues of proving reliance and scienter, the latter specifically not being elements of the GBL claim. (Stutman v Chemical Bank 95 NY2d 24, 29 [2000]).
C. The unjust enrichment claim.
Claims for unjust enrichment must show that the defendant (1) was enriched; (2) at plaintiff's expense; and (3) that "it is against equity and good conscience to permit defendant to retain what is sought to be recovered." (Albrechta v Broome County Indus Dev Agency, 274 AD2d 651, 652 [3d Dep't 2003]). Defendants cite to McGrath v Hilding, 41 NY2d 625 [1977] in support of their argument that the parties to the transaction, and the circumstances of the transaction, be examined to determine whether any enrichment was unjust. Defendants also urge that perhaps putative class members acted inequitably and knew of the discounted rate, yet, for "whatever reasons," did not request the discounted rate. The court finds that this line of reasoning too speculative to bar class certification at this stage and, in fact, borders on the humorous. No evidence is in the record to indicate a situation where a consumer actually knew that they were entitled to the discount and knowingly waived the discount in favor of paying a higher premium.
[*10]
The defendants raise an interesting point as to what portion of funds would be subject to disgorgement in light of the fact that they receive 15% of the premium cost versus the agencies which retain approximately 85%. The question of overpayment is common to the entire proposed class. Should liability be determined, disgorgement may be contemplated and percentages allocated at the appropriate time.
D. Additional contentions/issues of fact or law
The defense asserts that individual questions of law exist as to whether putative class-members had reason to know about the reduced rate, because knowledge is to be imputed either via their attorneys or mortgage brokers. Defendants frame a related question by asking whether notice to a fiduciary of the borrower constitutes notice to the borrower. Whether the TIRSA guidelines envisioned imputed knowledge or any other theory of knowledge on the behalf of a putative class-member is an issue for trial, and not to be decided at this point. Indeed, this seems to be a key point for trial. The TIRSA regulations state simply that, if the conditions are met, "the charge for insurance shall be" 50% or 70% of the of the "applicable loan rate." TIRSA Insurance Rate Manual § 14. In matters of statutory construction, the word shall is quite assertive. It appears that there is not much room to argue that the TIRSA guidelines and New York insurance law are not broken when rates that shall be charged are not. Emphasis supplied.
The TIRSA manual also says its "provisions are binding upon all members and subscribers of TIRSA and their agents and must be used on and after the effective date hereof unless a specific deviation from this manual has been filed by an individual member company with and approved by the Superintendent of Insurance." Id. at inside cover. All eight of the named defendants in these coordinated actions are members of TIRSA and therefore bound by the manual.
The defendants also assert that they have individual affirmative defenses to the claims of putative class members. These affirmative defenses include estoppel and waiver, which they claim hinge on the individual plaintiffs' states of mind. The defendants have also raised the specter of statute of limitations, accord and satisfaction, and ratification. "For these defenses," it is put forth, "defendants will need to know whether the title agency reached any subsequent agreement with individual borrowers." Defendants' Jt. Br. at 40. The affirmative defenses claimed do not prevent class certification. At issue, again, is whether the putative class was harmed by the actions of the defendants. "The statute clearly envisions authorization of class actions even where there are subsidiary questions of law or fact not common to the class. Friar v Vanguard Holding Corp., supra. If the defense does have legitimate affirmative defenses to the claims of various members, those defenses may be interposed subsequent to class certification. A noted authority on class action litigation, in discussing the federal class action commonality requirement, wrote:
The rule 23(a)(2) prerequisite requires only a single issue common
to the class. Individual issues will often be present in a class action,
especially in connection with individual defenses against class plaintiffs,
rights of individual class members to recover in the event a violation is
established, and the type or amount of relief individual class members may
be entitled to receive. Nevertheless, it is settled that the common issues
need not be dispositive of the litigation. The fact that class members must
individually demonstrate their right to recover will not bar a class action;
nor is a class action precluded by the presence of individual defenses against
class plaintiffs.
(Conte and Newberg, 1 Newberg on Class Actions, 4th Ed., § 3:12 [2002], emphasis added.)
[*11]
Not only does the existence of pled affirmative defenses not bar class certification, but several of the proposed defenses fail a critical logic test and do not go to the heart of the allegations. In logical terms, it is not plausible to think that a consumer, made aware of the opportunity to save hundreds of dollars, would choose to pay the higher rate and forego a savings mandated by law. (See, e.g., Friar v Vanguard Holding Corp., supra)("it is almost impossible to envisage circumstances in which a seller would willingly confer a financial gratuity upon the buyer's lender."). Plaintiffs allege that defendants' failure to provide the reduced premium rate at the closing and their failure to notify homeowners of the availability of the discounted rates misled them, and other reasonable homeowners acting reasonably under the circumstances, into paying the full rate. Whether defendants' failure to ensure they charged the correct rate or their simple acceptance of the full premium rate constituted any of the three alleged violations is the predominating question of law and fact.
Defendants plead statute of limitations as an affirmative defense. The class is to include individuals who have refinanced in the six years prior to the commencement of this action. The statute of limitations for claims created by statute is three years. (CPLR 214 [2]). But, "CPLR 214 (2) does not automatically apply to all causes of action in which a statutory remedy is sought, but only where liability 'would not exist but for the statute.'" (Gaidon v Guardian Life Insurance Co. of America, 96 NY2d 201, 208 [2001]). "Thus, CPLR 214 (2) 'does not apply to liabilities existing at common law which have been recognized or implemented by statute.' When this is the case," the statute of limitations for the common-law claim applies. (Id., internal citations omitted). The Court of Appeals in Gaidon reasoned that although General Business Law § 349 claims are quite similar to common law fraud causes, they are dissimilar enough that certain of them will be subjected to the three-year limitation of time from CPLR 214 (2). "It is not merely the absence of scienter that distinguishes a violation of section 349 from common-law fraud; section 349 encompasses a significantly wider range of deceptive business practices that were never previously condemned by decisional law." (Id. at 209-10). At this point in the litigation, with all claims intact, the court finds the General Business Law § 349 claim to have sufficient lineage with the common-law fraud claim to obtain coverage under CPLR 213 (1). Even if this were not so, the statute of limitations would not bar class certification. Such concerns could be dealt with via the use of a subclass. (Godwin Realty Associates v CATV Enterprises, Inc, 275 AD2d 269 [1st Dep't 2000]).
The statute of limitations for common-law fraud and unjust enrichment claims is six years. (CPLR 213 [8]; CPLR 213 [1]). Additionally, for actions sounding in fraud, the limitation of time is six years "from the time the plaintiff or the person under whom he claims discovered the fraud, or could with reasonable diligence have discovered it." (CPLR 213 [8]). This provides additional protection to the preservation of these claims, since the consumers here may not have had reason to know of any injury until well after the transaction, if ever.
Therefore, statue of limitations defenses are inapplicable against each of the three theories of recovery and do not prevent certification.
CPLR 901 [a] [3]. The claims or defenses of the representative parties are typical of the claims or defenses of the class; and CPLR [a][4]. The plaintiff will fairly and adequately protect the interests of the class.
Defendants' joint memorandum of law in opposition to class certification contains arguments on predominance of issues of law and fact. Conversely, the typicality and adequacy [*12]requirements present the defendants with the opportunity to examine and undermine the individual proposed representatives of each putative class. 
 It is essential that the plaintiff's claims be typical of the members of the putative class. The typicality requirement is satisfied where the "plaintiff's claim derives from the same practice or course of conduct that gave rise to the remaining claims of other class members and is based upon the same legal theory." (Friar v Vanguard Holding Corp., 78 AD2d at 99).
 The typicality requirement has been said to overlap to a certain degree with the requirement that the class representative fairly and adequately represent the interest of the class. However, each test must be independently satisfied in order to certify a class.
Adequacy of representation has three "primary components": Qualifications of counsel, ability of class representatives to assist their counsel, and the relationship between the interests of the class representatives and the interests of the other class members. Michels v Phoenix Home Life Mutual Insurance Comp., supra, at *28).
Nowhere have the defendants challenged the qualifications of the plaintiffs' counsel. It is clear that the Proposed Class Representatives have retained counsel experienced in litigating class action cases and this element is deemed satisfied. The remaining two facets of the prospective class representatives' adequacy is at issue to a varying degree with the name class representatives.
 The Schwartz plaintiffs. Defendant Stewart Title Company would attack the typicality of Mr. & Mrs. Schwartz by claiming the Schwartz's refinance transaction was not eligible for the discounted rate. The reason the Schwartz' did not qualify for the discount was because they erected a fence on the property, and in so doing may have altered the premises within the meaning of the TIRSA guidelines. An altered premises potentially creates new risks of insuring title. The TIRSA guidelines clearly state that one of the several criteria for eligibility for the discounted refinance rate is that "the premises to be insured are identical to the premises previously covered by eligible insurance." TIRSA Rate Manual § 14 (B) (1). If the defense's assertion is correct, the Schwartz' claim would not satisfy the typicality requirement because they would not have a claim.
 Defendant Stewart Title characterizes the fence as a possible "change in the risk continuum" for insuring title. The Schwartz plaintiffs contend they simply "replaced" a deteriorating wood fence for their "children's safety." (Schwartz Transcript at 58:22-59:7; 61:6-61:9.). Regardless, the TIRSA guidelines do not shed much light on the issue. Both sides note that the TIRSA manual does not contain a definition for "identical premises." The definition then becomes a question common to all members of the putative class.
 The Schwartz' sworn testimony indicates two important points. First, the fence erected went up in the exact same area of the old one, even using the same postholes. Second, and perhaps more importantly, the description of the premises on Stewart Title's Schedule A form, viewable in the record, is identical to that of the Schedule A description from the first title insurance transaction. That testimony is not in controversy. It seems that because defendant's own forms said the Schwartz' premises were identical; it is inappropriate to disqualify them as class representatives.
 Stewart Title also contends that certain facts in the Schwartz' case show the extent that individual issues of law and fact will predominate. Stewart Title claims "individualized inquiry would be necessary to determine whether there have been changes to the premises." In addition to the fence on the Schwartz' property, Stewart Title specifically mentions the possibility that liens, easements, encumbrances, and other such restraints on alienation would need to be dealt with for many members of a putative class. This proposition is a key part of the defenses' strategy, discussed herein; but it is one that this court feels presents common questions of law or fact instead of a reason [*13]to bar class certification. Further, it seems that putative class members would be required to swear to the status of their premises upon submission of claims.
 As for Stewart Title's contention that the Schwartz' lender was notified, and the Schwartz' themselves were likely notified of the discount, this goes to the issue of just what Stewart Title's obligations were in charging the reduced rate.
Further, the Schwartz' ability to assist counsel is not challenged and no issues arise in examining the relationship between the Schwartz' interests and the interest of the proposed class members.
The Werter Plaintiff. Defendants vigorously challenge Ms. Werter's ability to adequately represent the class. The adequacy of representation is related to the need for all members of the class to receive due process in the handling of their claims. Defendants focus exclusively on Ms. Werter's ability to vigorously prosecute the litigation. On this point the defendants subject Ms. Werter to great scrutiny. The defense contends that Ms. Werter is an inadequate representative because she "does not even have a basic handle on her own every day affairs." (Supplemental Mem. Of Law of Fidelity Nat'l., at 9). The assertion rests on Ms. Werter's inability to recall various names or other facts from her past. The plaintiffs contend that at deposition, Ms. Werter was able to give answers more satisfactory than "I don't recall" to 87% of questions posed. The defendants argue for rejection of Ms. Werter on grounds that her demonstrated lack of familiarity is too great to allow her to serve as an adequate class representative. Defendants cite In re Lloyd's American Trust Fund Litigation, 1998 WL 50211 (S.D.N.Y.). In Lloyd's, a proposed class representative was found inadequate because of her lack of familiarity with terms key to the litigation. Here, Ms. Werter indicated that she was unfamiliar with the concept of punitive damages, but she did show familiarity with the wrongs alleged and remedies sought by the lawsuit.
Lloyd's suggests that the nature and complexity of the litigation must be considered. Where Lloyd's involved insurance investments, trust agreements, and fiduciary relationships, these title insurance claims appear more straightforward. "An adequate representative of a class of prisoners or school children, for example, establishes a different threshold than a class of sophisticated investors." (Lloyd's at *11). Of course, a class of mortgage refinancers is different than school children and prisoners, but their threshold for adequacy must fall short of that for sophisticated investors. Even the defendants' line of cases suggests that a party "will be deemed inadequate only if she is startlingly unfamiliar with the case." (Id. at *12, citing Biancur v. Hickey, No. C 95-2145, 1997 WL 9857 at *9 [ND Cal. 1997]). That is not the case here and Ms. Werter may proceed as a class representative.
The Lawlor Plaintiff. Defendants argue Mr. Lawlor is inadequate to represent the class because he is the lessor of a leasehold interest in office space to Mr. Michael Gilmore's law firm, Sims Moss Kline & Davis LLP. Mr. Gilmore is an attorney assisting in representing the proposed class representatives in their quest for class certification. Additionally, Mr. Lawlor, an attorney, and Mr. Gilmore refer legal business to each other. It is argued that the financial relationship between Mr. Lawlor as lessor and Mr. Gilmore's law firm, and Mr. Gilmore himself as lessee, and referror and referral beneficiary creates a conflict of interest with regards to the litigation against National Title Insurance ("National"). Mr. Lawlor is seeking to represent the class of individuals that overpaid for insurance underwritten by National.
The potential for conflict of interest here is analogous to that of familial or direct employment relationships. In such situations it is important for the court to ensure that the "class representative have some measure of independence from the attorneys, or at least" ensure they are not "alter egos." [*14](Meachum v Outdoor World Corp, 171 Misc 2d 354, 371 [Sup Ct Queens County 1996]). The threshold of "some measure" mentioned in Meachum is met here. Mr. Lawlor, as an attorney, does not appear dependent entirely on and subservient to class-counsel. Further, defendants do not attack his claim otherwise, and he appears to meet the typicality requirement. The court concludes that Mr. Lawlor will be able to vigorously represent the interests of the putative class and is deemed an adequate representative.
The Williams Plaintiffs. Susan and Scott Williams are proposed representatives for the class with claims against Fidelity National Title. Ms. Williams has been employed by the law firm Wolf Popper LLP, class counsel in this action, for approximately five years. The question that arises in this situation is where does Ms. Williams' loyalty lie, with the members of the putative class she seeks to represent, or with her employer, who stand to gain substantial fees from this litigation?
The court in Meachum noted that no rule exists to support a proposition that class representatives are not adequate when they are employed by class counsel. Both Meachum and Tanzer v Turbodyne Corp, 68 AD2d 614 contain irregularities far beyond a simple employee-employer relationship. In Meachum, the court felt that the "totality of the circumstances, including the complicity of certain of the plaintiffs in the improper and unethical tape-recording of a conversation , has cast a cloud upon the proposed representation of the class-by-class counsel." (171 Misc at 374). In Ms. Williams' case, defendants do not contend there is impropriety on her part. It appears simply that subsequent to refinancing her home, she became aware of the allegations involved in the instant case.
The main danger posed is that Ms. Williams would sign off on a settlement that would be generous with attorney's fees yet miserly with payment to class members. However, it must be noted that in class actions, the court in New York maintains discretion to approve settlements and set attorney's fees. Without even a hint of impropriety on her part, it appears improper to disqualify Ms. Williams as a proposed class representative.
The Smajlaj Plaintiffs. Defendants urge that the Smajlajs are inadequate class representatives because Rosa Smajlaj previously was employed by Wolf Popper LLP, class counsel in this action. Defendants properly note, as with the Williams, too, that "relationships arising out of employment can compromise the independence of the class representative from that of the class counsel." (First American Title Co.'s Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification at 4). However, as with Ms. Williams, the defendants allege nothing beyond the previously existing employer-employee relationship to indicate an impropriety in Ms. Smajlaj serving as a class representative. Using reasoning similar to that used to determine Ms. Williams' ability to adequately represent the proposed class, the court concludes that Ms. Smajlaj is also an adequate representative.
The defendants do mention in passing the need for judicial concern regarding solicitation, maintenance, and champerty in class actions. However, the argument is not pressed and it does not appear from the record that any exists. Ms. Smajlaj had lunch with a former colleague from Wolf Popper, and apparently, in casual conversation the title insurance case topic arose. From there, Ms. Smajlaj asked a Wolf Popper attorney to help her determine whether she was overcharged. That determination was made, and Ms. Smajlaj requested a refund. When the refund was refused, Ms. Smajlaj joined the suit. It appears from this sequence of events that she has a typical claim and there is no evidence that she will not adequately represent the putative class.
Adam Good Plaintiff. Defendant American Pioneer Title Insurance Company ("American Pioneer") raises numerous issues regarding Mr. Good's ability to represent the putative class. Additionally, they echo the sentiments made in Defendant's Joint Br. on the predominance requirement.
[*15]
The predominance requirement for certification is met for all of the consolidated class actions, as generally discussed above. American Pioneer's discussion raises no point that changes that conclusion. The theories of recovery are based on asking why consumers overpaid for title insurance during refinancing. Defendant American Pioneer asserts that Mr. Good was unable to immediately produce evidence of prior insurance, was unable to calculate his own damages, was represented by both an attorney and mortgage broker during his refinancing, and that his mortgage broker suggested to the title insurance agent that Mr. Good might be eligible for the reduced rate. None of these assertions, assuming their veracity, negate the fact that the suit inquires into the behavior of the defendants. This inquiry is precisely where the predominance of fact and law is.

American Pioneer argues that Mr. Good cannot adequately represent the class because he was "not concerned" with closing costs. (American Pioneer's Suppl. Br. at 6). This theory does not sustain a credible challenge to Mr. Good's ability to adequately represent a putative class. It is probable that virtually everyone who refinanced paid more than they desired in closing costs, yet found other benefits to balance the drawbacks of such costs. Regardless, Mr. Good has affirmatively demonstrated that he meets the threshold requirement for representing a class.
The Piscioneri Plaintiffs. In connection with a mortgage refinancing of their home, Christina and Joseph Piscionari purchased a lender's policy of title insurance from defendant Commonwealth Title Insurance Company. The Piscioneris now seek to represent a class of plaintiffs already described in this decision in a class action against Commonwealth.
Commonwealth asserts that resolving the Piscioneri's claim will not establish Commonwealth's liability as against the rest of the proposed class. Commonwealth uses substantially the same argument as was put forth in Defendants' Jt. Br. The Piscioneri's use of a mortgage broker means they relied on the mortgage broker to obtain the best possible closing costs, title insurance included. Yet, as stated above, the complaint seeks to adjudicate alleged misconduct on the part of the defendants in connection with the rates they charged. The complaint seeks an analysis that focuses on the conduct of the defendants. The predominating issue of law and fact is did the defendants engage in the alleged misconduct.
Commonwealth challenges the typicality of the Piscioneri's claim. It is argued that because the Piscioneris engaged the services of a mortgage broker to handle closing arrangements, there is no "actual participation" in the transaction by the Piscioneris and therefore it cannot be "said that a plaintiff was deceived by an allegedly deceptive business practice." (Commonwealth's Supp. Br. at 18). This seems to be another way of arguing that common issues of fact and law will not predominate, an assertion already rejected. Further, the defendant cites no case law to support an "actual participation" theory. Such a theory is accepted to the degree that actual harm must be shown as an element of the GBL claim, and causation issues will be not be explored in great depth here.
Commonwealth also argues that the Piscioneris "reasonably could have, and should have," learned of the refinance rate from their mortgage broker. (Commonwealth's Supp. Br. at 18). However, it is likely that many members of the putative class followed the same road to refinance as the Piscioneris, and thus the claim is typical. "Relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories " (In re Prudential Ins. Co. of America Sales Litig., 148 F3d 283, 311 [3d Cir 1998]). The Piscioneri's theories for recovery are exactly the same as the rest of the putative class and arise from the substantially similar transactions.
The Piscioneri's adequacy as class representatives is not challenged. As their claims are typical and they are adequate class representatives, they may proceed as such.
[*16]
The Scuorzo Plaintiffs. Donna and Michael Scuorzo refinanced their home in 1999 and in conjunction with that transaction purchased a lender's policy from defendant Lawyers Title Insurance Corporation ("Lawyers Title"). The Scuorzos seek to represent a class described herein in an action against Lawyers Title. Lawyers Title asserts that the Scuorzos meet neither the typicality nor adequacy or representation requirements.
The Scuorzos plead a typical claim, that they were overcharged for a title insurance policy issued by Lawyers Title. Lawyers Title argues what appears to be a typical defense, that the responsibility for any overcharge and overpayment lies with intermediaries. It simply cannot be said that the Scuorzos claim is atypical of the claims of the other members of the putative class. All have the same common complaint described in detail above.
Adequacy issues arise because Donna Scuorzo is a cousin of Mr. Kent Bronson, of Wolf Popper LLP. Mr. Bronson is involved with representing the proposed classes. Mr. Bronson's name appears on several documents filed with the court in relation to this consolidated litigation and represented Ms. Scuorzo at her deposition.
The case law cited by defendant does not establish a rule that relatives of class counsel are per se inadequate. (Meachum, supra; Tanzer supra). In these cases relatives of class counsel were disqualified where there were other improprieties involved, as discussed in detail previously as to the Williams plaintiffs. Lawyers Title makes no allegation of any impropriety neither on the part of the Scuorzos nor class counsel. Indeed, evidence in the parties' submissions indicates that the process whereby the Scuorzos decided to litigate was not suspect, but arose as part of a casual conversation between Mr. Bronson and Mr. Scuorzo. Additionally, there is a body of precedent from the federal courts suggesting that class representatives are not inadequate simply because they are represented by a family member. (See In re Cardizem CD Antitrust Litigation, 200 FRD 326 [ED Mich 2001]); (In re Greenwich Pharmaceuticals Securities Litigation, 1993 WL 436031 [ED Pa 1993]); (Labaton v Universal Leaf Tobacco Co., Inc. 1978 US Dist LEXIS 20163 [SDNY 1978]).
It is thus concluded that the Scuorzos have typical claims and are adequate class representatives for purposes of the instant action.

CPLR 901 [a] [5]. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

 "A prime requisite of a class action is that it be superior to all other available methods for the fair and efficient adjudication of the controversy." (Cannon v Equitable Life Assurance Society of the US, 87 AD2d 403, 411 [2d Dep't 1982]). The class action device here seems appropriate. Nonetheless, because the class action device is "an exception to the principles that a person is entitled to determine whether, when and how to enforce his rights, it is essential" that available alternative methods of adjudication be considered. (Weinstein, et al., New York Civil Practice § 902.19). Alternative methods highlighted by the defense include adjudicating claims on an individual basis and administrative alternatives available from the NYSID.
As a preliminary matter, the NYSID has recently taken explicit cognizance of the allegations in the Coordinated Cases and initiated an investigation into title insurance rates charged in connection with mortgage refinancing transactions. That investigation appears to be directed to all of the underwriter members of TIRSA, not just the eight defendants in these cases. Defendants frame their argument for individual claim adjudication based on the possibility of an award of attorney's fees and treble damages in a General Business Law claim. Treble damages would [*17]be unavailable to members of a class, presumably. However, in weighing the benefit of the class mechanism against a plaintiff's ability to recover attorney's fees and treble damages, this court notes the value of each individual lawsuit, treble damages included, is probably too low to attract service of an attorney to prosecute the claim. Attorney's fees are awarded at the court's discretion and there would undoubtedly be a hesitation on the part of claimants to incur hourly counsel charges where a chance exists that attorney's fees would not be granted.
Administrative alternatives are also not superior to a class action in the instant matter. Plaintiffs point out that despite the heavy regulation of the insurance industry, including investigative and enforcement powers, there is a low likelihood that the full number of potential claimants will step forward to press an administrative proceeding. Although the likelihood of parties bringing claims to the NYSID is low, were the entire putative class to come forward with identical claims, that would be a waste of the NYSID's resources in the same way individually prosecuting the putative class members' claims in state court would be unduly burdensome on the judiciary.
Surely the CPLR 901 (a) (5) requirement of efficiency steers us towards the class action. Whether considering the resources of an administrative agency or the judiciary, prosecuting a large amount of claims individually instead of deciding the matter of liability once is simply not efficient.
The CPLR 901 (a) (5) requirement for fairness is satisfied by a class action as well. The possibility of varying outcomes for those similarly situated is precisely what is considered here. Also noted by the court is the likelihood that numerous claimants would likely not be able to get a lawyer to take their claim.
As a practical matter, a class action is not only a superior method of
adjudication, but the only method available for determining the issues raised,
for 'the damages that may have been sustained by any single [customer] will
almost certainly be insufficient to justify the expenses inherent in any
individual action, and the number of individuals involved is too large,
and the possibility of effective communication between them too remote,
to make practicable the traditional joinder of action.
(Weinberg v Hertz Corp supra at 5).
Comparison with Weinberg is apt because there the alleged conduct violated state statutes and local regulations. The court concluded that the class action device was superior to joinder of individual claims and administrative options for relief.
CPLR 902 Considerations. "Once the prerequisites are satisfied, the court must consider the factors set out in CPLR 902, to wit, the possible interest of class members in maintaining separate actions and the feasibility thereof, the existence of pending litigation regarding the same controversy, the desirability of the proposed class forum and the difficulties likely to be encountered in the management of a class action." (Ackerman v Price Waterhouse, supra at 191). This court has already taken the position that it is likely that putative class members have a comparatively small interest in bringing individual suits due to the moderate size of the alleged overpayments. It is also unlikely, even with the opportunity of attorney's fees awards and treble damages, that a claimant would find a lawyer to press the claim. Defendant's cite Castano v American Tobacco Co, 84 F3d 734 (5th Cir 1996) for the proposition that where attorney's fees are available, individual suits are feasible because plaintiff no longer faces the prospect of a "negative value suit." But in Castano, the court reasoned that individual suits were feasible because the claims of each individual was so large. In the present case, as plaintiffs note, claims are relatively small. For this reason, the court finds the [*18]class action appropriate.
As noted in this decision, NYSID is investigating TIRSA members regarding the reduced rate premiums at issue in these consolidated actions. Members of the putative class are likely to be well-served by vigorous representation by named-plaintiffs and class counsel in these cases. The pendency of a state regulatory investigation is no impediment to the certification of this class.
The issue of desirability of the forum is not fully ready for decision. While the parties may consent to try the case before this court, Unif. Civ. R., Tr. Cts. § 202.69 (c) (2), the consolidated cases may also be dispersed for trial. Defendants' only argument against concentration in one forum is that the New York real estate market is unique and regionalized, with local nuances pervading transactions. This argument is not persuasive, and further, it might be moot as these actions may be returned to the counties in which they were originally brought. There are several concerns raised by defendants in regards to the manageability of these cases as a class action which the court is required to analyze under section 902(5) of the CPLR. As a backdrop to the specific claims dispensed above, the defense argues that simply identifying members of the putative class is a gargantuan task arguing that the mere managerial tasks of the litigation weigh heavily against certification. The defendants contend that the structure of the mortgage policy premium sales business, and industry methods of record keeping, mean that it would take years to search the policy-holder files to determine eligibility for the reduced rate. In order to even identify the members of the classes defined in plaintiffs' complaints, the files of hundreds of thousands of loan policy transactions will have to be analyzed, and the vast majority of these files are in the hands of title insurance sellers involved in agency relationships with the defendants. Further, defendants assert that even a thorough search of their records would not necessarily clarify which policy holders were entitled to, or did or did not receive the reduced rate.
The record suggests this is not an insurmountable task. For example, Fidelity National Title conducted an audit of twenty files from policies sold by its agent, Superior Abstract Corporation. Fidelity National Title was able to determine that Superior had "charged the full rate instead of the discounted rate" for seven of the twenty reviewed transactions." (Raphael Affidavit at Exhibit 2). "Most of the underwriters maintain databases from which they can identify completed loan policy transactions in which the Refinance Rate was applied. No underwriter, however, maintains a database from which it can identify policies which might have been eligible for the Refinance Rate but were issued for another rate." (Defendants' Jt. Br. at 12).
While the process of reviewing all files may indeed be immense, this court is not persuaded that the task cannot be managed. There is reluctance, here, as well, to halt the pursuit of alleged misconduct affecting a potentially very large number of consumers because of the state of the defendants' records. It should also be noted that Insurance Law § 2319 (a) requires that "[e]very insurer and rate service organization shall within a reasonable time after receiving written request therefore, and upon payment of a reasonable charge, furnish to any insured affected by a rate made by it, or to the authorized representative of the insured, all pertinent information as to the rate."
In Weinberg v Hertz Corp., supra, the court was not swayed by the defendants' assertion that a class action was inappropriate because the cost of ascertaining the class was "unduly burdensome." (Weinberg at 4). Weinberg cited authority from California where the court ruled that the benefits of the class action for small consumer claims "outweighed any legal, administrative or economic burden on defendant in defining the class." (Id. at 5, citing Lazar v Hertz Corp, 143 Cal App 3d 128, 191 Cal Rptr 849 [1983]).
In deciding that manageability concerns do not preclude certification, this court is [*19]sensitive to the guiding principles, noted earlier, of the class action, namely that the mechanism be used when it will save valuable judicial resources. (See, Tegnazian v. Consolidated Edison, Inc., 189 Misc. 2d 152, 155, [Sup Ct NY County 2000]). The allegations made in the pleadings bring a set of questions of law and fact that are common to all putative class members that predominate over individual issues cited by the defendants. Bringing the claims of individual class members one at a time would place an undue strain on scarce judicial resources and raise the possibility of differing judgments for claimants substantially similarly situated. Thus this court finds that any manageability concerns fail to outweigh the need to try these cases as class actions.
Conclusion. Based on the reasons set forth in this decision, the court finds that plaintiffs have carried their burden on this motion for class certification. The requirements set out in CPLR 901 are satisfied and the factors considered by the court from CPLR 902 weigh in favor of certification. The classes are certified and this action will proceed accordingly.
Defining the class. Pursuant to CPLR 903, the class is to be described with this order permitting the class action. As proposed by plaintiffs, the class will consist of:
"all persons or entities in New York State who have refinanced their mortgages or fee interests on the identical premises within ten (10) years from the date of closing of their previously insured mortgage or fee interest, where there was no change in the fee ownership, and were charged a premium by defendant in an amount in excess of the reduced premium to the applicable loan rate filed on behalf of the Company with the NYSID (New York State Insurance Department) that they should have paid during the period from six (6) years prior to the date of the complaint through, and including, the date of resolution of this action (the "Class Period"). 
Pursuant to the authority vested in this court as the Coordinating Justice by Unif. Civ. R., Tr. Cts. § 202.69, the parties are hereby ordered to appear in court on February 10, 2004, at 9:30 A.M., for a Pre-trial Conference to determine the manner of class notification. The court expects proposed forms of notification to be produced on the aforesaid date and exchanged with adverse parties five days prior to said date. The parties shall be prepared to discuss as well the appropriateness of an opt-in versus an opt-out policy. On the above date a Preliminary Conference shall be held to set a schedule for all pre-trial discovery that might be needed in each case.
Dated: January 8, 2004 
J.S.C.
Decision Date: January 08, 2004